UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                   :
JOHN E. JOHNSTON and GINA JOHNSTON,                :
                                                   :
                        Plaintiffs,                :
                                                   :        **MEMORANDUM**
            -against-                              :        **AND ORDER**
                                                   :        09-CV-4432 (JG) (CLP)
PORT AUTHORITY OF NEW YORK AND                     :
NEW JERSEY, BRIAN SULLIVAN,                        :
TIMOTHY MCGOVERN, SAMUEL                            :
PLUMERI, MICHAEL MILNE, and JOSE                    :
ALBA, individually and in their official          :
Capacities,[1]                                     :
                                                   :
                        Defendants.                :
-------------------------------------------------------------x
A P P E A R A N C E S

        MALOOF LEBOWITZ CONNAHAN & OLESKE
                229 Broadway, Suite 1700
                New York, NY 10007
        By:     Jerald F. Oleske
                Charles J. Gayner
                *Attorneys for Plaintiffs*

        KARLA D. DENALLI
                The Port Authority of New York & New Jersey
                225 Park Avenue South, 13th Floor
                New York, NY 10003
                *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

        John E. Johnston ("Johnston"), a police officer with the Port Authority of New

York and New Jersey ("Port Authority"), and his wife Gina Johnston ("Mrs. Johnston") bring

this action against the Port Authority and five of its employees in connection with events

surrounding Johnston's 2008 administrative suspension from the Port Authority and his

---

[1]        The caption of the complaint also names "John Doe # 1-10" as defendants. The plaintiffs have
made no allegations involving individuals of unknown identity. Accordingly, I have removed "John Doe #1-10"
from the caption.

subsequent criminal prosecution for possession of a forged instrument and unlawful use or possession of an official police card. Defendants have moved for summary judgment, seeking dismissal of all claims. For the reasons stated below, the motion is granted in its entirety.

BACKGROUND

A.    *Factual Background*[2]

1.    *The Halloween Prank*

Johnston is a police officer in the Port Authority's Public Safety Department ("PSD"). (¶ 7.) In November 2008, he was assigned to the John F. Kennedy International Airport ("JFK") command. (*Id*.) In the early morning hours of November 1, 2008, Johnston was assigned to a post at JFK with fellow officer Frank Annuziata. (Johnston Dep. 95-96.) At some point that night, Annuziata engaged in what Johnston calls a Halloween prank. Specifically, Annuziata left Johnston in their patrol car, and when he returned, he told Johnston that he had smeared mustard underneath the door handle of their supervisor's car. (*Id*. 96-97.) The officers' supervisor, Sergeant Patrick Ryan, apparently perceived no humor in the situation, and he filed a criminal complaint report with the JFK command. (¶¶ 9-11.)

2.    *The Investigation, Suspension and Arrest of Johnston*

Detectives from the JFK command investigated the mustard caper. They recovered evidence, including a mustard jar found in a patrol car. They also searched a dumpster accessible only to the police and recovered another mustard jar, a cloth towel, paper towels, and a glove smeared with mustard. (¶¶ 12-14.) The Commanding Officer at the JFK command

[2]    Throughout this memorandum, citations to "¶ __" are to defendants' Rule 56.1 statement. (Defs.' Rule 56.1 Stmt., May 19, 2011, ECF No. 29.) The facts as stated in this section are taken principally from that document. As discussed below, plaintiffs have admitted all factual statements made therein. Johnston's September 17, 2010 deposition (Denalli Decl. Ex. B, May 18, 2011, ECF No. 28-2 ("Johnston Dep.")) has also been consulted here because of my obligation when deciding a Rule 56 motion for summary judgment to consider the evidence in the light most favorable to the non-moving party. *See Corcoran v. New York Power Auth.*, 202 F.3d 530, 533 (2d Cir. 1999).

contacted the PSD's Internal Affairs Division ("IAD"), a component of the Internal Affairs Bureau ("IAB"). (¶ 12.) Defendants Sergeant Jose Alba, Sergeant Michael Milne and Lieutenant Timothy McGovern, all PSD employees who were assigned to the IAB, visited the JFK command on November 3, 2008. (¶¶ 5, 13.) McGovern viewed video footage showing an officer operating and walking away from the patrol car in which one of the mustard jars had been found. (¶¶ 14-15.) A supervising officer who reviewed the video with McGovern identified the officer in the video as Johnston. (¶ 15.)

Later that night, McGovern conducted a post inspection of Johnston. (¶ 16.) In violation of regulations, Johnston did not have his driver's license or Port Authority police ID card on his person. (Johnston Dep. 83-84.) McGovern arranged transportation for Johnston to return to his personal vehicle to retrieve his driver's license and ID card. (*Id*. 84.) With McGovern's permission, before he returned to his car, Johnston called Police Benevolent Association ("PBA") representative William Piatti, because he believed he was being harassed by McGovern. (¶ 17; Johnston Dep. 86-87, 91.) During the post inspection, McGovern also confiscated Johnston's memo book because its cover was not in good condition, and he said he would give Johnston a new one. (Johnston Dep. 85.)

The following day, November 4, 2008, McGovern spoke to his supervisor, defendant Police Inspector Brian Sullivan, about the developing investigation of Johnston. (¶ 18.) Sullivan obtained authorization from defendant Samuel Plumeri – then Superintendent of Police and Director of PSD – to suspend Johnston. (¶¶ 6, 18.) McGovern, accompanied by Alba and Milne, returned to the JFK command that evening to suspend Johnston. (¶ 19.) After roll call, Johnston was directed by his tour commander to report to his office and to bring a PBA representative with him. (¶ 20.) Johnston arrived with Piatti at the tour commander's office and

found McGovern, Alba and Milne waiting for him there.  (¶ 20-21.)  McGovern handed Johnston a new memo book cover to replace the one he had taken the night before.  (Johnston Dep. 25.)  McGovern then asked Johnston for his Port Authority police ID card.  (*Id*. 25-26.)  When Johnston removed his Port Authority police ID from his wallet, McGovern "observed what appeared to him to be an NYPD ID card inside Johnston's wallet."  (¶ 24.)  McGovern asked to look at the NYPD card he had seen, but Johnston closed his wallet and returned it to his pocket.  (¶ 25.)  McGovern expressed his belief that he had seen an NYPD ID card and again asked to see it, at which point Piatti told him that the card was memorabilia and that Johnston did not have to turn it over.  (¶ 26.)  Johnston then removed the wallet from his pocket and took out an expired LaGuardia ID card from a compartment other than the one in which McGovern had glimpsed the NYPD card.  (¶ 27.)  McGovern said that the LaGuardia card was not what he had seen, and Piatti responded that it was.  (¶ 27.)  McGovern continued to ask for the card and eventually ordered that it be turned over, but Johnston refused.  (¶ 28.)

Milne contacted the NYPD, which confirmed that it wanted the ID card returned.  (¶ 29.)  McGovern contacted Sullivan, who in turn spoke with two Queens Assistant District Attorneys ("ADAs").  (¶ 29-30.)  The ADAs told Sullivan that he had probable cause to arrest Johnson for possession of the NYPD ID card.  (¶ 30.)  After these phone calls had been placed, Sullivan, PBA counsel John McAusland, and PBA vice president Bobby Morris arrived at the JFK tour commander's office.  (¶¶ 31; Johnston Dep. 45, 48, 51-52.)  Sullivan instructed Johnston to turn over the NYPD ID card, and when he did not comply, Sullivan told Milne to arrest him.  (¶ 31.)  Milne turned Johnston around and rear handcuffed him.  (Johnston Dep. 79.)  The wallet was recovered from his pants (¶ 32; Johnston Dep. 62-63), and Milne seized the NYPD ID card from the wallet (¶ 32).  Officials of the NYPD Internal Affairs Bureau, who had

arrived at the JFK command, examined the card and concluded that it was a forgery. (¶ 33.) McAusland, Piatti and Morris accompanied Johnston to a rear office, where one of them informed him that he was charged with criminal possession of a forged instrument. (Johnston Dep. 61-62; ¶ 34.) Johnston was issued a desk appearance ticket with a February 2009 return date and told that he was now under full suspension. (Johnston Dep. 63-64; ¶ 34.)[3]

3. *The Criminal Case*

Johnston was charged with criminal possession of a forged instrument in the third degree and unlawful use or possession of official police cards. (¶ 35.) The criminal information by which he was charged contained a sworn statement by McGovern that he had recovered an NYPD ID card from Johnston and had shown the card to an officer in the IAB, who informed him after an examination that the card was not genuine and that the police commissioner had not given permission for the card to be reproduced. (*See* Denalli Decl. Ex. K 118, 129, May 18, 2011, ECF No. 28-11 ("Ex. K").) On January 28, 2009, a Queens Criminal Court judge denied Johnston's motion to dismiss the information for facial insufficiency. (Ex. K 118-22.) After granting a request for reargument of Johnston's motion to dismiss, the court on April 13, 2009 deemed the information facially insufficient because it contained insufficient factual evidence of the requisite intent to defraud and insufficient nonhearsay facts indicating that the card was forged and issued without the police commissioner's permission. (Ex. K 128-132.) The information was dismissed. (Ex. K 142.)

The Queens County District Attorney's Office then filed a superseding information. (¶ 36-37.) This information was accompanied by an affidavit of Investigator Diane

---

[3]       Johnston estimated that he was detained in the back office for a few hours while he was booked and fingerprinted. (Johnston Dep. 64-65.) He was not handcuffed during that time. (*Id*. 64.) He was not placed in a holding cell and was permitted to use the restroom. (*Id*. 65.) Once his arrest was processed, Johnston was permitted to leave. (*Id*. 66.)

Klass of the NYPD Identification Card Unit, who had examined the card and, based on its color, text, shape, and texture, determined it to be a forgery. Klass also noted that the card bore an expiration date of December 31, 2006. Detective Thomas Janow of the NYPD also submitted an affidavit stating that his review of NYPD personnel records revealed that Johnston had resigned from the NYPD on July 16, 2002 and had surrendered his valid NYPD ID card to the NYPD at that time. (Ex. K 138-142.) Johnston moved for dismissal of the superseding information, and on June 12, 2009, it was dismissed as facially insufficient. (Ex. K 143-46.) This time, the court found that sufficient facts had been alleged that the card was forged and that the defendant knew it was forged, but held that the information contained insufficient allegations that Johnston intended to defraud another with the card. (*Id*.) The District Attorney's Office did not appeal the dismissal and did not file a new superseding information. (¶ 38.)

4.      *Johnston's Federal Case*

Johnston and his wife commenced this action on October 16, 2009 by filing a complaint against the Port Authority, Sullivan, McGovern, Plumeri, Milne, and Alba. Johnston asserts claims pursuant to 42 U.S.C. § 1983 for false arrest, malicious prosecution, and violation of his right to free speech. He also brings state common-law claims for assault, false arrest, false imprisonment, malicious prosecution, abuse of process, intentional infliction of emotional distress, and defamation. Mrs. Johnston brings a claim for loss of consortium. Both plaintiffs seek compensatory and punitive damages plus attorneys' fees and costs.

On May 18, 2011, the defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of all claims. As required by Rule 56.1 of the Local Civil Rules of the United States District Court for the Eastern District of New York, the defendants annexed to their motion a statement "of the material facts as to which the moving

party contends there is no genuine issue to be tried." Local R. 56.1(a). Rule 56.1 instructs a

party opposing summary judgment to submit a response to the moving party's Rule 56.1

statement. *Id*. 56.1(b). Each factual statement set forth in the movant's Rule 56.1 statement

"will be deemed to be admitted *for purposes of the motion* unless *specifically* controverted" in

the opposing Rule 56.1 statement. *Id*. 56.1(c) (emphasis in original). In opposing defendants'

summary judgment motion, plaintiffs have failed to respond to defendant's Rule 56.1 statement.

Accordingly, all facts contained in that statement are deemed admitted for the purposes of this

motion.

## DISCUSSION

A.    *Legal Standard for a Rule 56 Motion for Summary Judgment*

A motion for summary judgment should be granted only if the pleadings and

documentary evidence "show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "An issue of fact is

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "A

fact is material if it might affect the outcome of the suit under the governing law." *Id*. When

applying this standard, the court must "resolve all ambiguities, and credit all factual inferences

that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v.

Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks omitted).

B.    *The False Arrest and False Imprisonment Claims*

1.    *The Legal Standard for False Arrest and False Imprisonment*

Claims for false arrest under § 1983 are governed by the law of the state in which

the arrest occurred. *Amore v. Novarro*, 624 F.3d 522, 532 n.13 (2d Cir. 2010). Accordingly,

"[t]he elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (internal quotation marks omitted); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991). These elements are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118 (quoting *Broughton v. State*, 37 N.Y. 2d 451, 456 (1975)) (brackets omitted).

The existence of probable cause is a complete defense to a false arrest claim. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). Probable cause to arrest "exists where police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 469 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted). To establish probable cause to arrest, it is not necessary to make a "prima facie showing of criminal activity" or to show it is more probable than not that a crime has occurred. *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987). Nor is the goal of probable cause "to finally determine guilt through a weighing of evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

The defendants' motivation for arresting the plaintiff is irrelevant to the question of probable cause. *Lee v. Sandberg*, 136 F.3d 94, 103 n.5 (2d Cir. 1997) (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1179-80 (2d Cir. 1992)). Rather, probable cause is assessed objectively based on the facts warranting arrest and not the officers' reasons for the arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[T]he fact that the officer does not have the state of mind

which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action[.]" (internal quotation marks omitted)); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

        2.    *Application of the Legal Standard*

Johnston asserts that his superiors overreacted to the mustard caper. Although I agree with that assertion, at least on the record before me now, the principal question raised by the defendants' motion is whether, as a matter of law, probable cause supported Johnston's arrest. As Johnston's counsel acknowledged at oral argument, his false arrest claim is defeated if McGovern had probable cause to believe that Johnston possessed an NYPD ID card or a copy of such a card, which would violate New York Administrative Code § 14-108(6). Because I conclude there is no genuine issue of fact with regard to McGovern's probable cause to arrest Johnston, the false arrest and false imprisonment claims must fail, whether or not the Port Authority acted prudently in investigating Johnston.

Johnston was summoned to meet with McGovern and his colleagues on November 4, 2011 because he had been seen on video driving and walking away from a patrol car in which a mustard jar had been found after Ryan's car was smeared with mustard. Johnston was sent to the tour commander's office to be disciplined in connection with that event. By the time the meeting was over, Johnston was under arrest, but no reasonable jury could conclude that the IAB officers lacked probable cause to place him under arrest. Under New York Administrative Code § 14-108(6), it is unlawful for a person to have in his possession an official police department identification card without the permission of the police commissioner. Johnston has conceded that McGovern "observed what appeared to him to be an NYPD ID card

inside Johnston's wallet" when Johnston removed his Port Authority police ID card from the wallet. (¶ 24.) Johnston further acknowledges that McGovern knew at the time of the detention that Johnston was a retired NYPD officer, and therefore that he was no longer a member of the police department. (Pls.' Mem. Opp. Summary Judgment 6, May 27, 2011, ECF No. 31 ("Pls.' Mem.").) Based on these facts, no reasonable jury could find that McGovern lacked probable cause to conclude that Johnston was in possession of a police identification card without the permission of the commissioner. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (where plaintiff was carrying a badge resembling a police shield and did not have specific official authority to possess it, officers had probable cause to arrest him for suspected violation of code provision criminalizing possession without authority of objects resembling police badges).

Seeking to avoid this conclusion, Johnston makes two observations: (1) that McGovern had looked through Johnston's personnel folder several hours before the detention, where he saw a copy of an NYPD ID card and learned that Johnston was a retired NYPD officer, and (2) that "it is customary for retired police officers from NYPD to keep the cards as memorabilia." (Pls.' Mem. 5-6.) These facts serve only to undermine Johnston's case, as they constitute additional "reasonably trustworthy information of facts and circumstances" objectively supporting a reasonable belief that Johnston was in unauthorized possession of an NYPD ID card. *Walczyk*, 469 F.3d at 156. Johnston also admits that, at some point before his formal arrest, Piatti told McGovern that the ID card he had seen was memorabilia. (¶ 26.) In doing so, Piatti effectively confirmed McGovern's suspicions about what he had seen. Once Milne recovered the ID card from Johnston's wallet, the arresting officers knew with certainty that Johnston had been in possession of an NYPD ID card. Because these aspects of the record

preclude any genuine issue of fact as to probable cause for arrest, Johnston's state and federal claims for false arrest and false imprisonment are dismissed.

Finally, although Johnston, by failing to properly answer the defendants' Rule 56.1 statement, admitted facts sufficient to warrant granting the defendants' motion, his admissions are not necessary to that outcome. Even on Johnston's version of events, probable cause to arrest existed. As Johnston's counsel has acknowledged in his papers and at oral argument, (1) McGovern had observed a copy of Johnston's NYPD ID card in Johnston's file at Port Authority; (2) McGovern knew that as a resigned NYPD officer Johnston was no longer permitted to possess that ID or a copy of it; and (3) McGovern observed an ID card that closely resembled the NYPD ID in Johnston's wallet prior to the arrest. Moreover, Johnston does not dispute that, prior to the arrest and in response to McGovern's demand for the illicit ID, Piatti said that Johnston was in possession of the ID for memorabilia purposes. Whether or not the ID that McGovern glimpsed in Johnston's wallet was the NYPD ID or some other ID, the foregoing facts adequately supported McGovern in the reasonable belief that Johnston had committed an offense.[4]

C.      *The Malicious Prosecution Claims*

        1.      *Legal Standards for § 1983 and State Law Malicious Prosecution Claims*

        "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted). Under New York law, a malicious prosecution claim has four elements: (1) initiation of a proceeding against the

---

[4]      Additional discussion of the probable cause to prosecute Johnston is set forth in the discussion of his malicious prosecution claims, *infra*.

plaintiff; (2) termination of that proceeding in his favor; (3) lack of probable cause; and (4) malice. *Id*. at 161. However, malicious prosecution under state law does not constitute a constitutional tort unless the tortious conduct caused the plaintiff to suffer a violation of his rights under the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994); *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997). A § 1983 malicious prosecution claim therefore has a fifth element: the plaintiff must show that he suffered a deprivation of liberty resulting from the initiation or pendency of judicial proceedings. *Murphy*, 118 F.3d at 944.

2.    *Inability to Establish the § 1983 Deprivation of Liberty Element*

The judicial proceedings in this case were commenced by the filing of a misdemeanor information. *See* N.Y. Crim. P. L. § 100.05(1) ("[A] criminal action can be commenced . . . in a local criminal court, by the filing therewith of a local criminal court accusatory instrument, namely . . . [a]n information[.]"). Johnston argues that he suffered through approximately seven months of prosecution (Pls.' Mem. 3), but he does not allege that he was detained at any time during the course of the prosecution. Johnston contends that he was required to appear on four occasions in Queens Criminal Court between February 2, 2009 and June 19, 2009. (Johnston Dep. 70-73.) These required court appearances, without additional restrictions on his liberty, do not constitute a deprivation of liberty within the meaning of the Fourth Amendment.

In *Burg v. Gosselin*, the Second Circuit held that the requirement of a single court appearance, "without further restrictions, does not constitute a Fourth Amendment seizure." 591 F.3d 95, 98 (2d Cir. 2010). The court reasoned that the only arguable restriction on the plaintiff's liberty in that case was a single summons requiring her to appear in court on one occasion, which operated to effectuate due process and placed no direct restrictions on her ability

to travel. The court distinguished the case from *Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998), which found a Fourth Amendment seizure where a post-arraignment defendant was prohibited from leaving the State of New York. The *Burg* court noted that the plaintiff in *Murphy* had also been required to attend eight court proceedings and mused that the number of appearances required in a criminal case "may bear upon whether there was a seizure," but found it "hard to see how multiple appearances required by a court, or for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." *Burg*, 591 F.3d at 98.

Unlike the plaintiff in *Burg*, Johnston was required to appear in court on more than one occasion. However, the requirement that he appear on four separate occasions was not "accompanied by burdensome conditions that effect[ed] a significant restraint of liberty," *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975), and it was not itself a burdensome condition rising to the level of a constitutional injury. *See Corcoran v. Higgins*, No. 08 Civ. 10734 (HB), 2010 WL 1957231, at *4 (S.D.N.Y. May 13, 2010) ("Corcoran claims that she made 'multiple appearances' before the East Fishkill Town Court, but alleges nothing more to suggest that her repeated visits to the court, collectively, rose to the level of a Fourth Amendment seizure."); *Rotenberg v. Town of Mamaroneck*, No. 08 Civ. 4703 (JSR), 2010 WL 3468051, at *3 (S.D.N.Y. Aug. 24, 2010) ("[R]equiring plaintiffs to appear in court twice . . . is not a sufficient deprivation of liberty to rise to the level of a constitutional injury.). Accordingly, no reasonable jury could find the fifth element of a § 1983 claim for malicious prosecution satisfied, and the claim is appropriately dismissed.

3. *Inability to Establish Lack of Probable Cause*

A plaintiff asserting a claim for malicious prosecution under New York law need not establish a deprivation of liberty of constitutional dimensions. He must prove only four elements: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983). If Johnston cannot show any one of these elements, both his § 1983 and state law malicious prosecution claims must fail. There is no dispute that a proceeding was initiated against Johnston. However, defendants contend that the criminal prosecution did not terminate in Johnston's favor and that, based on the summary judgment record, no reasonable jury could conclude Johnston was prosecuted without probable cause or with malice. Probable cause to commence a criminal proceeding exists where a defendant has knowledge "of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon*, 60 N.Y.2d at 82; *see also Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (probable cause is "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" (internal quotation marks omitted)). Because I find as a matter of law that there was probable cause to prosecute Johnston in the underlying criminal action, I need not address the defendants' arguments respecting the favorable disposition and malice elements of Johnston's malicious prosecution claims.

a. *Probable Cause to Prosecute Under New York Administrative Code § 14-108*

Johnston was prosecuted under two state law provisions. First, he was charged under New York Administrative Code § 14-108, which prohibits, *inter alia*, possession of an official card issued by the NYPD, "or any copy or reproduction thereof," without permission of

the NYPD commissioner.  N.Y. Admin. Code § 14-108(6).  While this provision contains no requirement of scienter on its face, New York Penal Law §15.15(2) states, in part: "A statute defining the crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability."  In light of this provision, at least one New York court has read a *mens rea* into § 14-108, concluding that "§14-108 implicitly requires an element of knowledge, specifically that the defendant knew that his alleged possession of the forged instrument was not sanctioned by the New York City Police Commissioner."  *People v. Olwes*, 742 N.Y.S.2d 783, 787 (N.Y. City Crim. Ct. 2002).

The court that dismissed the information against Johnston on June 12, 2009 applied an even more stringent standard, holding that "a misdemeanor information charging custody or possession of the cards described in the statute, must also allege that a defendant possessed an intent to defraud, deceive or injure another[.]"  (Ex. K. 145.)  It therefore superimposed onto the regulation "an intent to defraud, deceive or injure."  This construction of the statute engrafted too stringent a *mens rea* onto the regulation.  I disagree that that Johnston must have possessed "an intent to defraud, deceive or injure" to have violated New York Administrative Code § 14-108.[5]  Rather, the elements of that violation are knowing possession of a copy of a police ID card with knowledge that the police commissioner has not sanctioned such possession.  Based on the record before me, no reasonable juror could conclude that the defendants were without probable cause to believe that these elements had been satisfied.  The evidence makes clear that the ID card was in Johnston's own wallet after he had resigned from the NYPD in 2002, and that it was official police policy that officers who resign are not permitted to retain their identification cards.

---

[5]  Johnston does not argue that I am collaterally estopped from disagreeing with the judge who dismissed the information, and I therefore need not consider whether I am bound by his finding of no probable cause.  *See Mastronardi v. Mitchell*, 486 N.Y.S.2d 762, 764 (2d Dep't 1985).

b. *Probable Cause to Prosecute Under New York Penal Law § 170.20*

Johnston was also prosecuted under New York Penal Law § 170.20, which, unlike Administrative Code § 14-108, contains a requirement of scienter on its face. Under Penal Code § 170.20, "[a] person is guilty of criminal possession of a forged instrument in the third degree when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses a forged instrument." There is no suggestion in the record that Johnston brandished the ID card or made any other affirmative attempt to use it for an unlawful purpose. However, New York Law does not require a showing of actual use or attempted use of a forged document in order to prove an intent to defraud. *People v. Rodriguez*, 897 N.Y.S.2d 42, 46 (1st Dep't 2010), *lv. granted*, 15 N.Y.3d 777 (2010). "Fraudulent intent is usually not susceptible of proof by direct evidence and must ordinarily be inferred from circumstantial evidence such as the defendant's knowledge of the misleading or deceptive nature [of his actions]." *People v. Sala*, 695 N.Y.S.2d 169, 188-89 (3d Dep't 1999), *aff'd*, 95 N.Y.2d 254 (2000). The circumstances surrounding Johnston's possession of the card were sufficient in this case to establish a reasonable likelihood that Johnston possessed it with intent to defraud.

The record contains ample evidence that the card was a forgery. Investigator Klass, in support of the April 30, 2009 information, testified that she had examined the card and observed as follows:

> the background behind the subject's photograph is a darker shade of blue than that used on valid New York City Police Department identification cards; that the writing on the subject card is distorted as is the police logo on the upper left hand side of the card; that these distortions are consistent with scanning of the original card through laminate; that the pedigree information on the subject card is in blue ink rather than the black ink used on valid identification cards; that the bottom right side of the card below the expiration

date of 12-31-06 is cut off, and that this feature does not occur on valid New York City Police Department identification cards; that the outer edges of the card are not rounded as valid identification cards are but are cut and uneven in a manner inconsistent with valid New York City Police Department identification cards; that the laminate on the subject card is thinner and more flexible than that used on valid New York City Police Department identification cards; that the subject card, when bent, caused the laminate to separate from the card due to an inadequate seal and that such does no[t] occur when a valid identification card is bent; that the rear of the card is a photocopy of an original sticker that appears on valid identification cards; that the printing on the back of the subject card is blurred and distorted as a result of copying through the laminate on the original card; that the sticker of the valid card would have caused ridges on the card 1/4 inch from the edge of the valid card, and that no such ridges appear on the subject card.

(Ex. K 139.)  In addition, Detective Janow testified based on state records that Johnston had resigned from the police force on July 16, 2002 and had surrendered his valid ID card at that time.  Based on these facts, the complaining officers had abundant cause to suspect that Johnston was in possession of a forged card.

Furthermore, given the evidence that the card was forged, there was a reasonable basis to believe that Johnston knew it was inauthentic and that he possessed it for an illegal purpose.  If Johnston returned his valid ID card in 2002, as the evidence suggests, he would have known that the card in his possession was a forged copy.  Although Johnston claims he had the card as memorabilia, the evidence establishes that Johnston did not simply keep an ID card as a souvenir, but affirmatively obtained a false identification card.[6]  The false card had an expiration date on it indicating it was valid for an additional four years after Johnston left the NYPD.  An

---

[6]     This case is therefore distinguishable from *People v. Days*, 25 Misc.3d 1220(A) (N.Y.City Crim. Ct. 2009), in which the defendant allegedly came unknowingly into possession of counterfeit currency.  When he discovered the bills were fraudulent, he did nothing, but kept them in his wallet.  The court dismissed the information filed against him for lack of probable cause to believe defendant intended to defraud, deceive or injure another, reasoning that, while the defendant's failure to rid himself of the bills once he knew they were counterfeit "may well have been foolish, it does not establish that he intended to pass the counterfeit bills."  In this case, by contrast, it is reasonable to believe that Johnston affirmatively created or otherwise obtained a false identification card, and that he did so with an intent to make use of it.

ID card generally "serve[s] no purpose other than to establish the identity of the holder[, and b]ecause the need for such proof arises only when the bearer seeks to obtain some privilege, right, benefit or entitlement," the complaining officers had reason to conclude "that there was no reason for the defendant to knowingly possess [a] false identity document[] unless he intended to present [it] as real, i.e., to defraud or deceive another." *Rodriguez*, 897 N.Y.S.2d at 46; *see also People v. Dallas*, 848 N.Y.S.2d 132 (1st Dep't 2007) ("The only conceivable purpose for [the false identity documents in defendant's possession], including a set of documents creating two different identities for the same person, was that they would be passed off as the genuine articles in order to deceive or defraud anyone to whom they were presented[.]")), *lv. denied*, 10 N.Y.3d 809 (2008), *reconsid'n Denied*, 10 N.Y.3d 933 (2008).

It is possible that at trial, the state would have been unable to establish beyond a reasonable doubt that Johnston possessed the requisite intent. *See, e.g., People v. Bailey*, 13 N.Y.3d 67 (2009) (vacating conviction for possession of a forged instrument where defendant knowingly possessed counterfeit $10 bills, because "drawing the inference of defendant's intent from his knowledge that the bills were counterfeit improperly shifts the burden of proof with respect to intent from the people to the defendant"); *People v. Brunson*, 888 N.Y.S.2d 22, 23 (1st Dep't 2009) (vacating conviction for possession of a forged instrument because "knowing possession of the forged card was not sufficient to prove intent" where defendant found in possession of altered state ID card "engaged in no conduct evincing an intent to use it"), *lv. denied*, 13 N.Y.3d 937 (2010). But the standard for determining a defendant's guilt at trial is not the standard for determining probable cause. Because the evidence supports an inference that Johnston purposefully created or obtained a fraudulent police ID card, which on its face indicated that he was an active member of the NYPD, a reasonably prudent person would have

sufficient basis for thinking it likely that Johnston intended to use the card for an illicit purpose. *People v. Barona*, 19 Misc. 2d 1122(A), at *3 (N.Y. City Crim. Ct.) ("[T]here is simply no reason to obtain or possess a New York State Identification Card unless one intends to use it in order to demonstrate one's identity. And there is, therefore, no reason to knowingly possess a *forged* state identification card unless one intends to present it as real – in other words, to defraud or deceive another."). Because the complaining officers had probable cause to prosecute Johnston under both Penal Law § 170.20 and Administrative Code § 14-108, Johnston's state and federal malicious prosecution claims are dismissed.[7]

D.     *The Free Speech Claim*

Johnston also raises a First Amendment claim. He contends that his arrest on November 4, 2008 "was the defendant officer's response to the plaintiff's verbal challenge to the officers of the rules of possessing a copy of an identification card as a memorial to the plaintiff's past services with the New York City Police Department." (Compl. ¶ 57.) He further alleges that his "verbal challenge is speech and plaintiff's possession of the identification card

---

[7]       Even if the complaining officers did not have probable cause to prosecute Johnston under Penal Law § 170.20, probable cause existed to prosecute him under Administrative Code § 14-108, and the former charge was not sufficiently distinct from the latter to deprive the complaining officers of probable cause to pursue the prosecution as a whole. Where some but not all charges were supported by probable cause, each charge must be analyzed separately to determine whether a malicious prosecution claim can proceed. *See Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (citing *Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989) (holding that, where defendant was convicted of disorderly conduct and acquitted of resisting arrest, unfavorable termination on former charge did not preclude malicious prosecution claim based on latter charge)). In some cases, multiple criminal charges in a single case may be sufficiently distinct to allow for liability on a malicious prosecution claim with respect to some, but not all, criminal charges. *Pichardo v. New York Police Dep't*, No. 98 CIV. 429 (DLC), 1998 WL 812049, at *3 (S.D.N.Y. Nov. 18, 1998) (citing *Posr*, 944 F.2d at 100); *see also Janetka*, 892 F.2d at 190. To determine whether charges are sufficiently distinct, courts have considered whether the alleged offenses rely on distinct allegations, whether they were directed at different individuals, and whether any one is a lesser included offense of another. *See Janetka*, 892 F.2d at 190; *Pichardo*, 1998 WL 812049, at *3. The Second Circuit has also emphasized that where charges are distinct from one another, disallowing a malicious prosecution claim on one charge because such a claim fails with respect to another charge is "particularly inappropriate . . . where the charge [that might sustain a malicious prosecution claim] was more serious than the one for which [a malicious prosecution claim cannot succeed]." *Janetka*, 892 F.2d at 190. Although the elements of the two crimes with which Johnston was charged are different, both arose from the same allegations – that Johnston possessed an unauthorized, fraudulent police ID card. Accordingly, the complaining officers had probable cause to pursue the prosecution as a whole.

constitutes an expression protected under the First and Fourteenth Amendment of the Constitution of the United States," and that his arrest violated his right to freedom of speech. (*Id.* ¶¶ 58-59.) The defendants move to dismiss Johnston's First Amendment claim, arguing that it is without merit. In response to the defendants' motion for summary judgment, Johnston offers no legal or factual support for his First Amendment claim. I therefore understand Johnston to have abandoned this claim. *See Bowen v. Westchester*, 706 F.Supp.2d 475, 492 (S.D.N.Y. 2010) (collecting cases).

The claim would in any event have failed. First, Johnston has identified no evidence in the record supporting his allegation that he made a "verbal challenge" to the prohibition on possessing an NYPD ID card. Even if he had made such a statement, there is no evidence that the officers arrested him because of that statement, rather than because he possessed the card illegally. Clearly, an individual who violates a criminal statute or regulation cannot insulate himself from arrest simply by challenging law enforcement officers' authority to arrest him and then claiming that he was arrested for his speech and not for the underlying violation. In addition, Johnston has made no argument and identified no facts indicating that he possessed the ID card with an "intent to convey a particularized message." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Indeed, Johnston emphasizes that the ID card was "outdated, unused, expired" and "buried" under other cards in his wallet, and suggests that he kept it only as personal memorabilia. (Pls.' Mem. 6.) Johnston has presented no evidence suggesting that he engaged in protected expressive activity, and his First Amendment claim is accordingly dismissed. *See Dickerson*, 604 F.3d at 733-34 (plaintiffs waived First Amendment claim where they failed to allege an intent to convey a message through possession of imitation police badges).

E.     *The Assault Claim*

Johnston alleges that the defendant police officers "touched [him] in a harmful and offensive manner and without privilege or consent from plaintiff" and are therefore liable for assault.  (Comp. ¶ 72.)  Under New York law, "[i]n the civil context, the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching," including "intentional wrongful physical contact with another person without consent."  *Girden v. Sandals Intern.*, 262 F.3d 195, 203 (2d Cir. 2001) (internal quotation marks and ellipses omitted).  The arresting officers came into physical contact with Johnston only when they turned him around, placed handcuffs on him, and patted him down to retrieve his wallet.  Officers executing a lawful arrest are privileged to commit any battery that is reasonably necessary to effect the arrest.  *Lorensen v. State*, 671 N.Y.S.2d.  Accordingly, the officers who handcuffed and frisked Johnston cannot be held liable for assault.

F.     *The Intentional Infliction of Emotional Distress Claim*

Johnston asserts a claim for intentional infliction of emotional distress ("IIED"). Under New York law, IIED has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993).  Johnston argues that McGovern's post inspection and Johnston's arrest were "extreme [and] outrageous" because they were motivated by "an obvious effort to find something on Plaintiff."  (Pls.' Mem.)  Even if the post inspection was motivated by malice, and even if the officers were without probable cause to arrest Johnston, no reasonable fact finder could describe such conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303 (1983). Accordingly, Johnston's IIED claim is dismissed.

G.       *The Defamation Claim*

Johnston alleges that the defendants telephoned his former employer, VIP Security and Transportation ("VIP"), and knowingly and recklessly made false statements about Johnston. Based on these allegations, he asserts a claim for defamation. To defeat a summary judgment motion, a plaintiff must present the court with admissible evidence sufficient to establish a genuine issue of material fact. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007). Johnston has cited no evidence in the record to support his defamation claim. He testified at his deposition that he had seen a VIP interoffice email which reported that McGovern had told a VIP employee in January or February of 2009 that Johnston "was in some trouble at [his] department, and he wanted to know if there were any complaints that were made against [Johnston] with the department[, and he] wanted to know if [Johnston] was working for [VIP] while [he] was out suspended." (Johnston Dep. 117-18.) The admissibility of Johnston's double-hearsay testimony is at best questionable, but even if reliable evidence supporting Johnston's account had been identified, it would present no genuine issue of material fact.

"A claim of defamation requires proof that the defendant made a false statement, published that statement to a third party without privilege, with fault measured by at least a negligence standard, and the statement caused special damages or constituted defamation per se." *Dickson v. Slezak*, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) (internal quotation marks omitted). "Truth provides a complete defense to defamation claims." *Dillon v. City of New York*, 704 N.Y.S.2d 1, 6 (1st Dep't 1999) (citing *Rinaldi v. Hold, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (1997), *cert. denied*, 434 U.S. 969 (1977)). The only factual statements McGovern is alleged to

have made to the VIP employee is that Johnston was "in some trouble at [his] department." Johnston admits that the call took place after his suspension and during the pendency of the criminal proceedings. Accordingly, there is no genuine issue as to the accuracy of McGovern's statement.

H.    *The Abuse of Process Claim*

Johnston contends that his arrest and the issuance of a desk appearance ticket were motivated by a "collateral objective outside the legitimate ends of the legal process and to retaliate against defendant for a prank committed by an unrelated person to this litigation." Comp. ¶ 54; Pls.' Mem. Opp. Summary Judgment 14. Under New York law, "[a]buse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984). Even assuming that Johnston has presented evidence that the officers who arrested him acted with a malicious motive, "malicious motive alone . . . does not give rise to a cause of action for abuse of process." *Id*. at 117; *see also Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution."). Regardless of a defendant's motives in making an arrest and issuing a desk appearance ticket, no abuse of process occurs where the defendant "used the process of the court for the purpose for which the law created it." *Hauser v. Bartow*, 273 N.Y. 370, 374 (1937). "Although [Johnston] does allege that the . . . defendants acted with an improper *motive*, [he] has not presented any evidence that [the defendants] had an ulterior *purpose* or *objective* in [pursuing] his prosecution." *Savino*, 331 F.3d at 78 (emphasis in original). In the absence of such evidence, the only reasonable

conclusion to be drawn from the record is that the defendants' objective in issuing the desk appearance ticket was to prosecute Johnston for the violations they had probable cause to believe he had committed.

F.      *The Loss of Consortium Claim*

The sole claim asserted on Mrs. Johnston's behalf is for loss of consortium. A wife's loss of consortium claim is derivative of the husband's claim, and where the primary claim is dismissed, the loss of consortium claim must also be dismissed. *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 508 (1968) ("Where . . . the husband's cause of action has been terminated either by judgment, settlement or otherwise, that should operate to bar the wife's cause of action for consortium."). Accordingly, Mrs. Johnston's loss of consortium claim is dismissed.

G.      *The Claim for Punitive Damages*

Finally, both plaintiffs seek punitive damages. "A demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 616 (1994). In New York, a claim for punitive damages must be dismissed where "there exists no cause of action upon which a demand for punitive damages can be grounded." *Prote Contracting Co., Inc. v. Board of Educ. of City of New York*, 714 N.Y.S.2d 36, 37-38 (1st Dep't 2000). Similarly, in § 1983 actions, "[a]n award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights[.]" *McFadden v. Sanchez*, 710 F.2d 907, 913 (2d Cir. 1983) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Accordingly, where, as here, no denial of rights is shown, punitive damages are not available.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in its entirety, and all plaintiffs' claims are dismissed.


So ordered.


John Gleeson, U.S.D.J.

Dated: July 28, 2011
      Brooklyn, New York